# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **MARIE TOOLE and CHRIS TOOLE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:06-cv-00652-MHT** |
| | ) | |
| **MATTHEW CHUPP; DON BRAMLETT** | ) | |
| **and ALFA INSURANCE COMPANY** | ) | |
| **and fictitious defendants A-F,** | ) | |
| | ) | |
| **Defendants.** | ) | |

COME NOW Matthew Chupp and Don Bramlett, two of the Defendants in the above-styled cause, who submit the following Brief and Evidentiary Submission in support of their pending Motion for Summary Judgment.

## I. STATEMENT OF THE CASE

This case originated with the filing of Plaintiff's Summons and Complaint on June 20, 2006, in the Circuit Court of Barbour County, Alabama.  In said complaint Plaintiffs Marie Toole and Chris Toole averred that they had been injured in an automobile accident involving a car owned by Defendant Don Bramlett and driven by Defendant Matthew Chupp.  Based thereon, Plaintiffs have made claims for: 1) Negligence; 2) Wantonness; and, 3) Loss of Consortium against Defendants Chupp and Bramlett; Plaintiffs also seek UIM/UM benefits from their own insurer, Defendant Alfa Insurance Company.   After removal of this case from the Circuit Court of Barbour County to this Court, the Defendants have all filed Answers to Plaintiff's Complaint and have denied the allegations contained therein.  (A copy of Plaintiff's Complaint is attached hereto as **Exhibit A**).

## II. STATEMENT OF UNDISPUTED FACTS

Attached as Exhibit B to this Brief and Evidentiary Submission are excerpts of the Deposition testimony of Marie Toole, one of the Plaintiffs in this cause. Mrs. Toole testified that she was traveling south on Highway 431 in Eufaula when she came upon a highway construction zone on the road. The normal speed limit on the road in question was fifty-five miles per hour. Mrs. Toole was flagged to come to a complete stop by a road construction worker and she did so. While she was stopped her vehicle was hit from behind by a red pickup truck which she saw approaching her vehicle. (**Exhibit B**, p. 31, lines 11-20; p. 35, lines 18-21; p. 37, lines 4-22; p. 40, lines 10-14; 42-46, entire pages).

Matthew Chupp testified by deposition; excerpts of the same are attached hereto as **Exhibit C**. Chupp testified that he was driving down Highway 431 behind Mrs. Toole when he entered a construction zone; while traveling bumper to bumper through the zone he looked down for a second and then looked up, inadvertently hitting Mrs. Toole's vehicle, which had come to a stop in front of him. Chupp estimated at the time of impact he was traveling approximately twenty-five miles per hour; he also testified that at the time of impact he was not talking upon either a cellphone or a Nextel. (Exhibit C, pp. 18-19 (entire pages); p. 24, lines 3-11).

Don Bramlett testified by deposition; certain excerpts of Mr. Bramlett's testimony are attached hereto as **Exhibit D**. It is undisputed that Mr. Bramlett was not the driver of the vehicle which ran into Mrs. Toole at the time the accident occurred. (Exhibit D, p. 5, lines 24-25). While Mr. Bramlett initially testified that he thought that he was the owner of the pickup truck being driven by Matthew Chupp at the time of the accident with Mrs. Toole, he later corrected this testimony and stated that the truck in question was actually titled in the name of his wife, Lucinda Janelle Bramlett, at the time of the accident. (Exhibit D, p. 6, lines 18-23; p. 26, lines 4-9).

### III. STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." Rule 56(c), *Federal Rules of Civil Procedure*; See also *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996). "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). That burden may be satisfied either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the nonmoving party has failed to make a showing "sufficient to establish the existence of an element essential to the [nonmovant]'s case, and on which that party will bear the burden of proof at trial." See *Celotex*, supra, 477 U.S. at 322. It is well-settled that the Court, in passing on a motion for summary judgment, must view all evidence and resolve all reasonable inferences in favor of the nonmoving party. *Zipperer v. City of Fort Myers*, 41 F.3d 619, 622 (11th Cir. 1995).

Once the movant has met its burden under Rule 56(e) by showing that there are no genuine issues of material fact or that the nonmovant lacks an essential element, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court noted further "[t]hat the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." In the event the nonmovant fails to

advance sufficient evidence to support a jury finding for the nonmovant, the Court may properly grant summary judgment. Id. at 249-50.


## IV. ARGUMENTS AND CONCLUSIONS OF LAW

In their complaint, Plaintiffs have made claims against Defendants Matthew Chupp and Don Bramlett for: 1) Negligence; 2) Wantonness; and, 3) Loss of Consortium. (See Exhibit A, Counts II-VI of plaintiff's complaint.)  However, an examination of these claims, even when viewed in a light most favorable to the Plaintiffs, reveals that Matthew Chupp and Don Bramlett are entitled to the entry of summary judgment.


**1.      Matthew Chupp is Entitled to the Entry of Summary Judgment as to Plaintiff's Claims of Wantonness.**

A review of the undisputed evidence presented in this cause, even when viewed in a light most favorable to the Plaintiffs, reveals that Matthew Chupp is due the entry of summary judgment in his favor as to Plaintiffs' claims of wantonness.  The Alabama Supreme Court has repeatedly emphasized that the tort of wantonness is not simply an aggravated form of negligence:

> Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability.  Implicit and wanton, willful or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act with likely result in injury. . . .

> Negligence is usually characterized as inattention, thoughtlessness, or heedlessness, and lack of due care, whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act. 'Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted. *McNeil v. Munson S.S. Lines*, 184 Ala. 420, [423], 63 So. 992 (1913).

Willful and wanton conduct has a well-defined meaning at law.  It is sometimes

expressed in terms of 'reckless disregard of the safety of another.'  Willful and
wanton conduct should not be confused with negligence.  It has been correctly stated
that the two concepts are as 'unmixable as oil and water.'

"........

Willfulness and wantonness imports premeditation, or knowledge and consciousness
that the injury is likely to result from the act done or from the omission to act, and
strictly speaking, is not within the meaning of the term "negligence," which conveys
the idea of inadvertence, as distinguished from premeditation or formed intention."

*Ex parte Anderson*, 682 So.2d 467, 470 (Ala. 1996).

A review of all of the evidence in this cause, even when viewed in a light most favorable to

the Plaintiffs, reveals no evidence to suggest an issue of fact as to wanton behavior on the part

Matthew Chupp.  The evidence is instead that Chupp rear-ended Mrs. Toole after she had stopped

on the road when flagged to do so by a road construction worker.  Chupp testified that while

traveling in the construction zone behind Mrs. Toole he looked down for a second and then looked

up, inadvertently hitting Mrs. Toole's vehicle, which had come to a complete stop; he estimated at

the time of impact he was traveling approximately twenty-five miles per hour.  (Exhibit C, p.19

(entire page); p. 24, lines 3-11). There is no evidence that Chupp was on a cellphone, or a Nextel,

at the time of the accident, or that he was intoxicated and/or driving recklessly at the time of the

accident.    (Exhibit C, p. 18 (entire page).  Even when viewed in a light most favorable to the

Plaintiffs, the foregoing evidence, which is undisputed, suggests at best an issue of fact as to simple

negligence, and as such Matthew Chupp is due the entry of summary judgment as to Plaintiffs'

claims of wantonness as a matter of law, on the grounds that there is simply no evidence at all to

suggest an issue of fact as to such a claim.


2.    **Don Bramlett is Entitled to the Entry of Summary Judgment as to Plaintiff's
Claims of Negligence and/or Wantonness.**

A further review of the undisputed evidence reveals that Defendant Don Bramlett is due the entry of summary judgment as to all of Plaintiffs' claims, even when all of the evidence concerning the same is viewed in a light most favorable to the Plaintiffs. Plaintiffs have averred that Bramlett was negligent and/or wanton in his conduct towards them[1]. Negligence is the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something that a reasonably prudent person would not have done under the same or similar circumstances. *Elba Wood Products, Inc., v. Brackin*, 356 So.2d 119 (Ala. 1978). To recover under a negligence action, the plaintiff must establish 1) that the defendant owed a duty to the plaintiff; 2) that the defendant breached that duty; 3) that the plaintiff suffered a loss or injury; and 4) that the defendant's negligence was the actual and proximate cause of that loss or injury. *Lollar v. Poe*, 622 So. 2d 902 (Ala. 1993).

A review of the undisputed evidence here, even when viewed in a light most favorable to the Plaintiffs, reveals that Don Bramlett is entitled to the entry of summary judgment as to the Plaintiffs' claims of negligence. Don Bramlett testified in his deposition that he did not own the vehicle which was being driven by Matthew Chupp at the time of the accident - his wife did - and the evidence is also undisputed that Bramlett was not driving the vehicle in question at the time of the accident. See (Exhibit D, p. 5, lines 24-25; p. 6, lines 18-23; p. 26, lines 4-9). Accordingly, there is no issue of fact as to whether Bramlett owed a duty to the Tooles, or whether he breached any duty, or whether

---

[1]Plaintiffs have not pled a claim for negligent entrustment against Bramlett, but, to the extent that Plaintiffs attempt to raise such a claim, Bramlett would also be entitled to summary judgment as 1) he is demonstrably not the owner of the pickup truck and 2) there is no evidence to suggest that Matthew Chupp was an incompetent driver, other than possibly his youth, which is insufficient as a matter of law. See *Thedford v. Payne*, 813 So.2d 905, 911 (Ala. Civ. App. 2001) (Liability for negligent entrustment will not be imposed upon the parents of a young driver involved in an accident, based solely upon the driver's youth; trial court reversed for denying defendant's motion for judgment as a matter of law as to this issue).

any breach of a duty by Bramlett proximately caused injury to the Tooles in any way, even when all of the evidence is viewed in a light most favorable to the Tooles. Also, as previously discussed at length, there is simply no evidence whatsoever that any actions by Bramlett in this cause could constitute wanton behavior, let alone negligent behavior and thus Bramlett is due the entry of summary judgment as to any such claims, even when all of the evidence is viewed in a light most favorable to the Plaintiffs.

## V. CONCLUSION

Based upon the foregoing, it is clear that both Alabama precedent and the undisputed evidence presented in this cause mandate the entry of summary judgment in favor of Matthew Chupp as to Plaintiffs' claims of negligence, and in favor of Don Bramlett as to Plaintiffs' claims of both negligence and/or wantonness, on the grounds that there are no genuine issues of material fact and that these Defendants are entitled to judgment as a matter of law.

Respectfully Submitted this 5th day of January, 2007.


 /s/ *Randall Morgan*
RANDALL MORGAN [MOR037]
DOY LEALE MCCALL, III [MCC087]
Attorneys for Defendants Matthew Chupp and
Don Bramlett

OF COUNSEL:

**HILL, HILL, CARTER, FRANCO,
       COLE & BLACK, P.C.**
425 South Perry Street
P.O. Box 116
Montgomery, AL 36101-0116
(334) 834-7600
(334) 263-5969 - FAX

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been duly served by **electronic filing** and by placing a copy of same in the **U.S**. **Mail**, properly addressed and first class postage prepaid this the 5th of January, 2007 upon the following:

Jim S. Calton, Jr., Esq.
CALTON & CALTON
226 East Broad Street
P O Box 895
Eufaula,  AL 36072
FAX - 334-687-3564
**www.attorneycalton.com**

Courtney R. Potthoff, Esq.
Joel P. Smith, Jr., Esq.
WILLIAMS, POTTHOFF,
   WILLIAMS & SMITH, LLC
125 South Orange Avenue
Eufaula, Alabama 36072

   /s/ *Randall Morgan*
OF COUNSEL



EXHIBIT

A

IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA
EUFAULA DIVISION

Marie Toole; Chris Toole,                          )
                                                   )
        Plaintiffs,                                )
                                                   )
vs.                                                )     CIVIL ACTION NO.: CV-06- 94
                                                   )     (Trial By Jury Demanded)
Matthew Chupp; Don Bramlett; and Alfa Insurance    )
Company; and Fictitious Defendants "A" an          )
Alabama resident, "B," "C,"and Fictitious          )
Defendants "D," "E," and "F" whether singular or   )
plural, those other persons, corporations, firms or)
other entities whose wrongful conduct caused or    )
contributed to cause the injuries and damages to the )
Plaintiff, all of whose true and correct names are )
unknown to the Plaintiff at this time, but will be )
substituted by amendment when ascertained,         )
                                                   )
        Defendants.                                )



FILED
JUN 2 0 2006
DAVID S. NIX, CLERK
BARBOUR COUNTY, ALABAMA

COMPLAINT

COME NOW the Plaintiffs in this cause and state as follows:

STATEMENT OF THE PARTIES

1.      Plaintiff, Marie Toole, individually, is over the age of nineteen (19) years of age and

resides at 211 Pebble Beach Drive, Eufaula, Barbour County, Alabama and was such at the time of the

accident complained of.

2.      Plaintiff, Chris Toole, individually, is over the age of nineteen (19) years and resides at 211

Pebble Beach Drive, Eufaula, Barbour County, Alabama and is the husband of Marie Toole.

3.      Defendant, Matthew Chupp is over the age of nineteen (19) years of age and resides at 10

Cape Charles Avenue, Hampton, Georgia 30228.

4.      Defendant Don Bramlett is believed to be over the age of nineteen (19) years and resides at

78 Nail Road, McDonough, Georgia 30253 and is the owner of the automobile driven by the Defendant,

Matthew Chupp at the time and place of the accident described further in this complaint.

5.  Defendant Alfa Insurance Company is an Alabama corporation licensed to sell insurance in the State of Alabama. This Defendant conducts business in Eufaula, Barbour County, Alabama. This Defendant is the uninsured/underinsured automobile insurance carrier for the Plaintiffs, which issued a policy of coverage that was in full force and effect at the time of the incident complained.

6.  Fictitious Defendants "A" who is believed to be an Alabama citizen, corporation and/or other entity over the age of nineteen (19) and "B", "C", and "D", "E", "F", whether singular or plural, are those other persons, corporations, firms or other entities who own, leased, maintained, inspected and/or repaired the automobile driven by Defendant, Matthew Chupp and owned by Defendant, Don Bramlett, whose wrongful conduct caused or contributed to cause the injuries and damages to the Plaintiffs, all whose true and correct names are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained in accordance with A.R.C.P. Rule 9 and Rule 15.

7.  Plaintiff, Marie Toole was involved in an automobile accident with the individually named Defendant which occurred on July 9th, 2004 in Eufaula, Barbour County, Alabama.

<u>COUNT ONE</u>

8.  Plaintiff, Marie Toole adopts and re-alleges the averments of fact contained in all paragraphs preceding in this complaint by reference as though fully set out herein.

9.  On or about the 9th day of July, 2004, upon a public highway known as the Bakerhill Highway in the City of Eufaula, Barbour County, Alabama, the Defendant, Matthew Chupp, while driving an automobile owned by the Defendant, Don Bramlett, negligently/wantonly and/or recklessly allowed said automobile to collide with an automobile being driven, occupied and owned by the Plaintiff,

10.  As a proximate result of the Defendant's negligent/wanton and/or reckless conduct, the

Plaintiff was made sick, sore, and lame as to injuries in her back, neck, arms and entire body. The Plaintiff suffered a painful injury and permanent disability to her shoulder/rotator cuff which ultimately required surgery and may require additional surgery in the future. The Plaintiff incurred medical bills in and about an effort to heal herself, endured significant pain and suffering, inconvenience, mental anguish and emotional distress and will be caused to experience lifelong pain and suffering into the future.

11.   Plaintiff's vehicle was damaged, bent, battered and broken, and rendered less in value.

12.   Plaintiff claims compensatory and punitive damages of the Defendants for personal injuries due to the Defendant's negligent, wanton, and/or reckless conduct and claims property damages for the diminished value of her automobile.

WHEREFORE, Plaintiff, demands judgment against the Defendants in such sum as the jury determines reasonable under the circumstances.

## LOSS OF CONSORTIUM

## COUNT TWO

13.   Plaintiff, Chris Toole, adopts and re-alleges the averment of fact contained in all paragraphs preceding in this complaint by reference as though fully set out herein.

14.   As a proximate result of the Defendant's said negligence, wantonness and/or recklessness, the Plaintiff, Chris Toole was caused to temporarily lose the companionship, society, care, support, and consortium, of his beloved wife, Marie Toole and will continue to suffer in the future due to the diminished nature of consortium with his beloved wife all of which was caused by the Defendant's negligent, wanton, and/or reckless conduct.

WHEREFORE, Plaintiff, Chris Toole, demands judgment against the Defendants in an amount of compensatory and punitive damages which the jury deems fair and just to compensate the Plaintiff for his loss.

UNINSURED/UNDERINSURED MOTORIST

COUNT THREE

15.    These Plaintiffs, adopt and re-allege the averment of fact contained in all paragraphs preceding in this complaint by reference as though fully set out herein.

16.    Prior to the collision heretofore described, Defendant Alfa Insurance Company, for and in consideration of a valuable premium agreed to and paid by Plaintiffs, issued a policy of automobile insurance associated with claim number A153669 which was in full force and effect at the time of the incidents complained. Said policy of insurance insured the Plaintiffs against loss or injury arising out of an automobile collision involving an uninsured and/or underinsured motor vehicle.

17.    On July 9, 2004, while said policy of insurance was still in full force and effect, Marie Toole suffered physical injury, as a result of collision when a vehicle driven by Defendant Matthew Chupp, and owned by Defendant Don Bramlett collided with her insured automobile.

18.    The Defendants, Matthew Chupp and Don Bramlett are either uninsured or underinsured within the meaning of the Alfa Insurance policy and as defined by Alabama law.

19.    Thereafter, and within due time as prescribed in the policy of insurance, Defendant Alfa Insurance Company was notified of how, when and where said collision and loss happened and of the injuries sustained by Marie Toole. In addition, each and every term, condition, and provision of the policy of insurance to be performed as a prerequisite to the recovery of benefits has been fully and completely performed.

WHEREFORE, Plaintiff demands judgment against the Defendant Alfa Insurance Company in an amount of compensatory damages and punitive damages which the jury deems fair and just to compensate the Plaintiff along with cost of court.

## NEGLIGENT ENTRUSTMENT

### COUNT FOUR

20.     These Plaintiffs, adopt and re-allege the averment of fact contained in all paragraphs preceding in this complaint by reference as though fully set out herein.

21.     The Defendant, Don Bramlett, either knew or should have known that the Defendant, Matthew Chupp could not and would not and in fact did not operate the automobile which had been entrusted to him, in a safe and reasonable manner. The Defendant, Bramlett, violated Section 32-5A-190(A), Code of Alabama, when he drove his vehicle carelessly and heedlessly and willfully, wantonly or recklessly, disregarding the rights or safety of persons or property, or without due caution and circumspection and at a speed or in a manner so as to endanger or likely to endanger any person or property.

22.     As a proximate consequence of the negligent entrustment of a vehicle by Defendant, Don Bramlett to Defendant, Matthew Chupp, Plaintiffs received injuries arising out of said accident.

WHEREFORE Plaintiffs demand judgment against Defendants and in an amount of punitive and compensatory damages which the jury deems fair and just.

Jim S. Calton, Jr. (CAL052)
Attorney for Plaintiffs

OF COUNSEL:
CALTON & CALTON
226 East Broad Street
P.O. Box 895
Eufaula, AL 36072-0895
(334) 687-3563/3564-fax
www.attorneycalton.com

JUN 20 '06 16:09

PLAINTIFFS DEMAND TRIAL BY JURY

OF COUNSEL

JUN 28 '06 16:09



# COPY

EXHIBIT

B

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

1

2

3

4

5 MARIE TOOLE and CHRIS TOOLE,

6         Plaintiffs,

7 Vs.                              CIVIL ACTION NO.
                                   2:06 CV-00652-MHT

8 MATTHEW CHUPP; DON
BRAMLETT & ALFA INSURANCE
9 COMPANY and fictitious
defendants A - F,

10

        Defendants.

11

12           * * * * * * * * * * * * *

13

14      **DEPOSITION OF MARIE TOOLE**, taken pursuant to

15 stipulation and agreement before Pamela A. Wilbanks,

16 Registered Professional Reporter and Commissioner for

17 the State of Alabama at Large, in the Law Offices of

18 Calton & Calton, 226 East Broad Street, Eufaula,

19 Alabama, on Thursday, December 7, 2006, commencing at

20 approximately 10:00 a.m.

21

22           * * * * * * * * * * * *

23

31

1          complaints or problems with your shoulder,

2          upper back or upper neck; is that true?

3     A.   Yes.

4     Q.   What day of the week did this accident occur?

5     A.   Towards the end of the week I do believe.  I

6          do believe it was like a Thursday or a

7          Friday.  I'm not certain.

8     Q.   What time?

9     A.   It was in the early afternoon because we had

10         gone to town to get lunch.

11    Q.   Who had gone to town to get lunch?

12    A.   Myself and two children.

13    Q.   Where did you leave from?

14    A.   Woodlawn Estates.

15    Q.   Is that where your home is?

16    A.   My grandmother's home.

17    Q.   And where did you drive to?

18    A.   Hart's Chicken.

19    Q.   Where is that located?

20    A.   Downtown Eufaula.

21    Q.   What route do you take from Woodlawn Estates

22         to Hart's Chicken?

23    A.   Four-lane straight and back, 431.

35

1  Q.  Was it paid for or were you making payments?

2  A.  Making payments.

3  Q.  And you were insured with Alfa?

4  A.  Yes.

5  Q.  Was that considered your car?

6  A.  Yes.

7  Q.  Was the title in your name or you and your

8      husband's name?  Who was the title on?

9  A.  Probably both of our names.

10 Q.  But that's the one you used?

11 A.  Yes.

12 Q.  And you had not had any wrecks or

13     fender-benders or accidents in it?

14 A.  No.

15 Q.  What about when you bought it?  Had it had any

16     prior wrecks or accidents or anything?

17 A.  No.

18 Q.  As you were returning home on 431, where on

19     431 did this accident happen?

20 A.  Almost at the intersection of Baker Hill

21     Highway.

22 Q.  Baker Hill?

23 A.  Yes.  I'm not sure the road number.

37

1   A.   Yes.

2   Q.   What I call the fast lane?

3   A.   Yes.

4   Q.   Were you actually moving or were you stopped

5        at the time?

6   A.   I was stopped.

7   Q.   Were you stopped at the light?

8   A.   I was -- There was a construction man there.

9   Q.   Flagging people down?

10  A.   Yes.

11  Q.   Where was he standing?  Was he on 431 or was

12       he actually in the intersection of 431 and

13       Baker Hill Highway?

14  A.   He was in the median between the two 431s,

15       between the two sides on 431.

16  Q.   Were they doing some work there at the

17       intersection of 431 and Baker Hill?

18  A.   I think they were paving the road.  I'm not

19       sure.

20  Q.   He was actually stopping traffic with his

21       flag?

22  A.   Yes.

23  Q.   What lane was he in or where was he standing?

1    than you?

2  A.  Yes.

3  Q.  Did you notice that vehicle in front of you or

4      pay any attention to it until after the

5      accident?

6  A.  No.

7  Q.  So you don't know how long it had been in

8      front of you?

9  A.  No.

10  Q.  What about the vehicle behind you?  Did you

11      see it before the accident?

12  A.  I saw it when it was coming up behind me.

13  Q.  You were already stopped at that point?

14  A.  Yes.

15  Q.  Why did you see it as it was coming up behind

16      you?

17  A.  Because it was coming so close to me, and I

18      knew it was going to hit me.

19  Q.  Assume that's true.  Why would you be looking

20      in your rear view mirror at that time?

21  A.  Because I was stopped, and I was glancing at

22      one of the children in the back seat.

23  Q.  So there are five, six, seven vehicles stopped

42

```
 1        paperwork?
 2   A.   I would assume.
 3   Q.   Do you remember how much it cost to repair?
 4   A.   I do not.
 5   Q.   So when you're stopped and you glance up in
 6        the back, what do you see?
 7   A.   Red pickup.
 8   Q.   How close was he?
 9   A.   I'm not sure.  He was coming up behind me.
10   Q.   What is the speed limit there -- normal speed
11        limit?
12   A.   Fifty-five.
13   Q.   Is it in the city limits?
14   A.   Yes.
15   Q.   How many car lengths would you say he was
16        behind you when you first noticed him or first
17        saw him?
18   A.   Maybe two.
19   Q.   What did you see as you looked in the rear
20        view mirror?
21   A.   A red pickup coming at me.
22   Q.   Did it appear to be slowing, not slowing or --
23   A.   Not slowing.
```

43

1   Q.   -- did you notice?  Not slowing?

2        Do you have any opinion on its speed?

3   A.   I don't have any idea.

4   Q.   As you looked in the rear view mirror, could

5        you identify that there were people in the

6        vehicle --

7   A.   Yes.

8   Q.   -- or did you just see the vehicle?

9   A.   No.  There were people in the vehicle.

10  Q.   How many did -- I'm asking you this now

11       before --

12  A.   Before the wreck?

13  Q.   -- before the accident.  How many people were

14       in the vehicle?

15  A.   I couldn't tell you for sure.

16  Q.   Was there anything that would help you or that

17       you could remember about distinguishing the

18       driver before the accident?

19  A.   When he was far off or close up?

20  Q.   Did you watch it all the way?

21  A.   No.

22  Q.   So you looked up --

23  A.   I saw him when he hit me.

44

1    Q.    Is that the first time that you saw the red

2         truck?

3    A.    No. I saw the red truck coming.

4    Q.    About two car lengths you said?

5    A.    Right.

6    Q.    And did you watch it the entire time?

7    A.    Maybe occasionally.

8    Q.    Well, how long a period of time did it take

9         for that --

10    A.    Not long.

11    Q.    -- vehicle to go those two car lengths?

12    A.    Not long.

13    Q.    Did you divert your eyes away from the red

14         truck at any time?

15    A.    Not other than just glancing up to make sure

16         that the cars in front of me were still

17         stopped, no.

18    Q.    You looked in your rear view mirror and you

19         saw this red truck?

20    A.    Yes.

21    Q.    And then you looked forward to see if the cars

22         in front of you were stopped?

23    A.    Yes.

1    Q.   And I assume they were?

2    A.   Yes.

3    Q.   And then you looked back in your rear view

4         mirror?

5    A.   Yes.

6    Q.   What was happening then?

7    A.   The red truck was right there.

8    Q.   Did you actually see the impact?

9    A.   I don't remember.  I think I saw him when he

10        got really close to me.

11   Q.   The first time that you saw it, other than

12        just seeing that there was a red truck behind

13        you, did you watch it for any period of time?

14   A.   I watched and could see that there was a truck

15        coming at a faster rate, and I was sitting

16        still.

17   Q.   And that's when you looked forward?

18   A.   Yes.

19   Q.   And then when you looked back, he was about to

20        hit you?

21   A.   Yes.

22   Q.   And I may have asked you this.  And if I did,

23        I apologize.  Were you actually watching it as

46

1      the impact occurred?

2  A.   Yes.

3  Q.   Were you watching the truck or were you

4      actually looking at the driver or what were

5      you looking at?

6  A.   I am not sure.

7  Q.   If that had been all you saw was up to the

8      impact and you didn't get out or they didn't

9      get out and you didn't see anybody get out of

10     the truck or whatever, all you saw was up to

11     the impact, at that point had you seen

12     anything that would help you identify the

13     driver or any of the passengers?

14  A.   Yes.  The driver.  He had on a blue shirt, I

15     think.

16  Q.   Anything other than a blue shirt?

17  A.   No.

18  Q.   Well, did you see the passenger?

19  A.   There was a girl in there and another guy.

20  Q.   Could you tell where they were sitting?  I'm

21     asking you to do this before the impact.

22  A.   Right.  No.

23  Q.   You don't know where -- Did you see the girl



EXHIBIT

_C_

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


MARIE TOOLE AND CHRIS TOOLE,      )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )          CIVIL ACTION FILE
                                  )          NO. 2:06CV652-VPM
ALFA MUTUAL INSURANCE COMPANY,    )
MATTHEW CHUPP; AND DON            )
BRAMLETT,                         )
                                  )
          Defendants.             )



     Oral Deposition of **MATTHEW CHUPP**, called by the

plaintiff, before Leita J. Seaborn, Certified Court Reporter

and Notary Public State at Large, taken at the Old City Hall

Police Department, Train Depot 21, East Main Street,

Hampton, Georgia, on the 6th day of December, 2006,

commencing at 10:00 a.m EST.



                    LEITA J. SEABORN
                 Certified Court Reporter
                   Post Office Box 151
                 Eufaula, Alabama  36072
                    (334-616-0621)
                    (706) 660-8118



18

1       At any point in time during the trip did you ever talk
2    on your cell phone?
3        A.   I don't believe so.
4        Q.   Do you remember if Donnie ever did?
5        A.   Yes.
6        Q.   Okay.  Do you know who he was speaking to?
7        A.   His dad.
8        Q.   Is that before the wreck or after the wreck?
9        A.   Before.
10       Q.   Sometimes you see cars that are traveling with
11    each other have these two-way communications devices.  Did
12    y'all have those?
13       A.   No, sir.
14       Q.   Your Nextel, did Ted have a Nextel?
15       A.   Yes, sir.
16       Q.   Could y'all communicate on the two-way frequency
17    with one another?
18       A.   We could.
19       Q.   Did y'all?
20       A.   Sure.  We did -- Yeah.  We had to tell him we were
21    stopping so they would stop.
22       Q.   At the time of the wreck were you talking to Ted
23    or anything on your Nextel --
24       A.   No, sir.
25       Q.   -- communicating with them.

1    Take me through how the wreck happened.  Tell me what

2  led up to it and then what happened.

3    A.    We had just stopped at McDonald's to get something

4  to eat, and we were pulling out.  And a car got in between

5  us, Ted's grandmom and us.  And we were right there in

6  Eufaula.  And they were doing traffic -- or construction.

7  And I guess it was bumper to bumper, and I just looked down

8  for a second and looked back up.  And I hit my brakes and

9  ran into the back of it.

10    Q.    And when you say you looked down for a second,

11 what would have drawn your attention away from driving?

12    A.    I think it was something like just itching my leg

13 or something little like that.

14    Q.    In your interrogatories -- Did you read the

15 interrogatories that I sent to you and to your attorney?

16    A.    Yes, sir.

17    Q.    Do you remember those?

18    A.    Yes, sir.

19    Q.    It was a list of questions.  You had said I

20 believe in there that y'all had stopped at Burger King.

21    A.    Maybe it was Burger King.

22    Q.    I'm not trying to trick you up.  I trying to get

23 the facts right on that.  It was McDonald's or Burger King.

24    A.    Maybe it was Burger King.  You know, honestly, I

25 can't remember.  It was one or the other.

24

1    traffic --

2        A.    Yes, sir.

3        Q.    -- and you looked away for a second.  How fast do

4    you think you were traveling at that point?

5        A.    Couldn't have been faster than 25.

6        Q.    Have you seen the accident report?

7        A.    No, sir.

8        Q.    The accident report has an estimated speed at 25

9    miles per hour.  Would you disagree with that or think

10   that's about right?

11       A.    That's about right.

12       Q.    Was the vehicle in front of you, Mrs. Toole, my

13   client, was she at a complete stop at impact; or was she in

14   the process of stopping, if you remember?

15       A.    I can't remember.

16       Q.    Is there -- Was there anything that obstructed

17   your view from the road?  Was the sun in your eyes?

18       A.    No, sir.

19       Q.    The road wasn't wet.  I mean was it a sunny day, a

20   cloudy day?

21       A.    I believe it might have been sunny.

22       Q.    Had you ever driven through Eufaula?  You've told

23   me that you'd driven to the beach a couple times with your

24   parents, but have you ever driven through Eufaula yourself?

25       A.    No, sir.

EXHIBIT

_D_

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARIE TOOLE AND CHRIS TOOLE,      )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )      CIVIL ACTION FILE
                                  )      NO. 2:06CV652-VPM
ALFA MUTUAL INSURANCE COMPANY,    )
MATTHEW CHUPP; AND DON            )
BRAMLETT,                         )
                                  )
          Defendants.             )


     Oral Deposition of **DON MARSHALL BRAMLETT, SR.,** called

by the plaintiff, before Leita J. Seaborn, Certified Court

Reporter and Notary Public State at Large, taken at the Old

City Hall Police Department, Train Depot 21, East Main

Street, Hampton, Georgia, on the 6th day of December, 2006,

commencing at 11:45 a.m EST.


                    LEITA J. SEABORN
                 Certified Court Reporter
                   Post Office Box 151
                  Eufaula, Alabama  36072
                    (334-616-0621)
                    (706) 660-8118



5

1      A.   No.

2      Q.   Is that the case that you were talking about --

3      A.   No, no, no.  The first one was an actual case

4  where I was actually working in the crew as a supervisor.

5      Q.   Okay.

6      A.   So I was a witness in that case.

7      Q.   In the cases where you were the expert, you think

8  there has been at least two that you can think of?

9      A.   Two of them.  I'm almost positive it was only two.

10      Q.   Did you just evaluate the facts and give your

11  opinion --

12      A.   That's basically what I did.

13      Q.   -- as an expert?

14       So you'll understand the questions that I'd ask you

15  today you're under oath.  And I'll ask them; you'll answer

16  them.  And my assumption is that you will give me a truthful

17  answer.

18      A.   Absolutely.

19      Q.   Is that fair?

20      A.   That's my understanding.

21      Q.   That's a fair assumption?

22      A.   That's exactly what I intend to do.

23      Q.   All right.  And I'm really not going to have that

24  many questions for you.  Obviously, you weren't involved in

25  the wreck.  But I need some background information, and I

6

1   just thought that you would be the right person for me to

2   ask.  And, of course, since you own the vehicle and it was

3   your insurance policy that's why you're named.

4        When is Donnie's birthday?

5        A.   March 30, 1988.  I didn't know you were going to

6   ask hard questions.

7        Q.   Next one is your anniversary.

8        A.   Oh, no.

9        Q.   Just kidding.  Don't need that one for today.

10       A.   Boy, my heart jumped a beat.

11       Q.   March the 30th, 1988.  This wreck happened on July

12  9, 2004, so he was 16; is that correct?

13       A.   That's correct.

14       Q.   So he had just turned 16 a couple months before,

15  several months before?

16       A.   That's right.

17       Q.   Three months.

18        Did you own the Ford F-150 that he was driving?

19       A.   Yes.

20       Q.   Where had you purchased it?

21       A.   I had purchased it from an individual who lives

22  locally here.

23       Q.   What year model?

24       A.   It was a 1998.

25       Q.   Do you recall what kind of mileage you had on it

26

1      A.    Yes.

2      Q.    Who was your insurance company at that time?

3      A.    EMC.   That was under my company policy.

4      Q.    Whose name is this truck or was this truck F-150

5    titled in?

6      A.    My name -- No, I take that back.   It was titled in

7    my wife's name.   I'm just now recalling that, Lucinda

8    Janelle Bramlett (Phonetic).   The title was actually in her

9    name, I believe.

10     Q.    Was the truck paid for when you bought it?

11     A.    Yes.

12     Q.    With cash?

13     A.    Yes.

14     Q.    What insurance company is EMS?

15     A.    I can't remember the full name.   They're out of

16   Alabama, I believe.

17     Q.    Did you ever take any pictures of the truck that

18   had damage to the bumper?

19     A.    There was so little damage.   It wasn't anything

20   really to take a picture of.   The bumper, if you put your

21   hands on it, was a little loose; but other than that wasn't

22   anything visibly wrong with it.

23     Q.    Was the truck, it was an F-150, was it lifted or

24   modified in any way?

25     A.    It had big tires on it.